UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CARMEN FALBO, JR., | ) |
| Plaintiff, | ) |
| | ) Case. No. 07 C 4710 |
| v. | ) |
| | ) Magistrate Judge |
| MICHAEL J. ASTRUE, Commissioner | ) Arlander Keys |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Carmen Falbo, Jr., filed this lawsuit seeking
review of the decision of the Commissioner of Social Security
(the "Commissioner") to deny his claim for Disability Insurance
Benefits ("DIB"). The case is currently before the Court on
cross motions for summary judgment: Mr. Falbo asks the Court to
reverse the Commissioner's decision and/or remand the matter; the
Commissioner asks the Court to affirm the decision denying
benefits. For the reasons set forth below, the Court grants the
plaintiff's motion and denies the Commissioner's motion.

## FACTS AND PROCEDURAL HISTORY

Mr. Falbo filed an application for Disability Insurance
Benefits on December 17, 2004, just a few months after his 48th
birthday. In his application, he alleged that he had been unable

to work since October 2, 2003 because of problems with his knee. The Social Security Administration denied his application initially and on reconsideration. Mr. Falbo requested a hearing before an Administrative Law Judge (ALJ), and the case was assigned to ALJ John Kraybill, who held the requested hearing on October 4, 2006 – just two days before Mr. Falbo's 50th birthday.

At the hearing, the ALJ heard from Mr. Falbo, Mr. Falbo's cousin, Ronnie Gough, a medical expert, and a vocational expert. Mr. Falbo testified that he lives in Bensenville with his fiancee; he has three children, ages 26, 18 and 16. The 18- and 16-year-olds lived with him recently, but the 18-year-old moved out and the 16-year-old went back to living with her mother; he has little or nothing to do with the 26-year-old. Record at 226.

Mr. Falbo testified that he is a journeyman construction electrician by trade; he testified that he completed high school, as well as four years of trade school and has worked as a union electrician for over 30 years. He testified that he last worked as a construction electrician for Gibson Electric.

With regard to his medical issues, Mr. Falbo testified that he has had problems with his right knee since the mid-1990s, that he had "an ACL done" in 1996, and that things just kept getting worse, to the point where it started to affect his ability to do his job. He testified that he had a partial knee replacement surgery in 2004 and then a full knee replacement in October 2005.

2

He testified that he continues to have pain and swelling and thinks this might have something to do with his other conditions (he suffers from Hepatits C and cirrhosis of the liver). He testified that his main problem is his knee; he testified that his chest is still a bit sore from when he had a nodule removed from his lung, but that the issue is largely resolved; and he testified that his hepatitis and cirrhosis really don't affect him or his ability to do things. He testified that, to his knowledge, his hepatitis is hereditary and not caused by drinking; he testified that he has not consumed alcohol since 1996, when, in the course of being prepared for his ACL surgery, he first learned he had hepatitis and cirrhosis of the liver.

With regard to his daily activities, Mr. Falbo testified that he mostly just sits and walks a bit; he testified that he helps with the laundry when he can (though he can't carry the baskets) and he helps with the grocery shopping when he can (though he has to use a motorized cart in the store and can't carry any heavy bags); he testified that he cooks and socializes sometimes with his cousin. He testified that he uses a cane to walk and leans on the railing to get up and down stairs; he testified that he has to ice and elevate his knee constantly and that minor activity - walking, standing, even sitting funny - causes his knee to swell and become painful.

The ALJ also heard from Mr. Falbo's cousin, Ronnie Gough, who confirmed that Mr. Falbo's knee issues prevent him from being as active as he used to be; he testified that Mr. Falbo can't walk or stand for long before his knee swells up and has to be iced and elevated.

Next, the ALJ heard from a medical expert, who first noted the absence of certain important records – namely, the post-operative and follow-up records from the second knee surgery, the therapy records from that same time period, and any records relating to his blood work and liver issues. The ALJ agreed to hold the record open to allow Mr. Falbo's attorney to secure that medical evidence.

The ALJ also heard from a vocational expert, who testified that Mr. Falbo's past work as an electrician would be classified as medium to heavy and skilled in nature; the VE also testified that Mr. Falbo's past work had no transferable skills. Record, 264.

In addition to the hearing testimony, the ALJ considered medical evidence documenting Mr. Falbo's conditions and treatment. First, the record includes documentation covering Mr. Falbo's care and treatment at Resurrection Medical Center. Those records show that Mr. Falbo first sought medical attention for his knee on February 4, 1994, shortly after he slipped on some ice; at that time, he reported that, since slipping, he

4

experienced pain in his knee when he would squat while working as an electrician, and he had started using crutches because of the pain. Record at 183. As it turned out, Mr. Falbo had torn his medial meniscus and his ACL; he underwent an arthroscopic partial medial meniscectomy on his right knee on February 14, 1994. A post-operative note shows that, in the wake of the procedure, Mr. Falbo was referred for physical therapy, with the hope that he could soon return to work as an electrician. Record at 183. The record shows that, one month after the procedure, Mr. Falbo was complaining about pain in his knee; the plan was for him to finish physical therapy and return to work. Record at 181.

The record shows that Mr. Falbo next complained about his knee about four years after the meniscectomy and ACL repair. On July 14, 1998, Mr. Falbo reported that he slipped on a wet spot at work and sustained an injury to his lower back and right knee; he reported that, since the slip, he experienced constant pain in his lower back and significant instability and pain in his knee. Record at 181. Follow up reports show that Mr. Falbo started using a knee brace, which seemed to help somewhat, though he was still experiencing pain. Record at 180. On August 11, 1998, he was told that, if his symptoms could not be controlled with exercise therapy, he may need to consider additional surgery. Record at 180. Mr. Falbo returned on September 1, 1998, still complaining of pain; he reported that his knee was giving out

5

constantly, even with activities of daily living, and that he was having to wear the brace all the time; despite the brace, he reported, he continued to experience pain and swelling in his knee; he reported that he had only been able to tolerate three physical therapy sessions because the exercises aggravated his knee. Record at 180. Mr. Falbo's doctor noted that he was "much more unstable that he was in 1994" and referred him for surgery.

A pre-operative report dated September 21, 1998 indicates that Mr. Falbo's knee was "unstable" and "anterior cruciate deficient." Record at 178. Mr. Falbo underwent right knee arthroscopy on September 23, 1998. Record at 177. Five days later, he was doing "fairly well"; his knee was "only mildly swollen . . . not too swollen." Record at 177. The doctor recommended rehab, passive motion and icing. *Id*. As of September 30, 1998, he was, according to his doctor, not able to return to work or light duty. Record at 176. Two weeks post-surgery, Mr. Falbo was "doing well"; he was bearing some minor weight on his right knee, the swelling had decreased and his range of motion had increased. *Id*. By November 5, 1998, he was showing "improvement in all parameters." Record at 172. By November 13, 1998, his surgeon had determined that he could be returned to light duty status at work, provided he could be mostly sedentary with restricted stair/ladder climbing and

6

squatting; he also recommended that Mr. Falbo continue with
physical therapy 3 times per week.  Record at 172.

In December, Mr. Falbo reported that his knee was swelling,
which could be controlled with ice; his therapist confirmed the
swelling.  Record at 171.  By January of 1999, he was complaining
of swelling and soreness and reporting difficulty with squatting
and bending, though he was continuing with physical therapy.  *Id.*
In February, the doctor reported that Mr. Falbo had improved,
though he was still complaining of difficulty squatting and
kneeling; he reported that his knee had stopped giving out and
that he was having less trouble going up and down stairs; his
therapist's reports confirmed his improvement.  Record at 170.

A progress report from April 7, 1999 indicates that, at that
time, Mr. Falbo was "doing much better"; he was still complaining
of minor difficulty kneeling and of minor pain, but he had
"excellent" range of motion and no instability; he had completed
his physical therapy course and was able to run and jog slightly
and use the stationary bike.  Record at 169.  His doctor
indicated that he was released to work full duty capacity as of
April 16, 1999.  *Id.*

The record shows that Mr. Falbo next complained of knee pain
on October 6, 2004.  At that time, he went to Resurrection,
complaining of a painful swollen calf and knee.  Record at 167.
He reported that he had returned to work, without incident, after

his surgery in 1998, but that he had recently been experiencing increasing swelling and pain, to the point where it was affecting his ability to function; he reported no clear injury or trauma. Record at 167. After a couple of follow-up visits, his doctor recommended a debridement arthroscopy, which was performed on November 19, 2004. Record at 165-166. At a follow-up visit on December 8, 2004, Dr. Hayek noted "some improvement, still some mild grinding . . . [m]ild swelling." Record at 165. He also noted that, during the surgery, "[d]egenerative findings were noted." Id. At his next follow-up, on January 5, 2005, Dr. Hayek reported that Mr. Falbo "has had no significant improvement after his arthroscopy, he has pain over the medial joint. He has varus. He has difficulty with squatting, bending, no significant swelling, no giving way." Record at 165. In Dr. Hayek's assessment, Mr. Falbo has, at that point, "quite a difficult problem. He is a laborer and needs to squat. I don't believe he is going to have significant relief with osteotomy due to his pain in the medial compartment. He has exposed bone." Record at 165. He indicated, however, that Mr. Falbo might have better pain relief and a better result with a total knee arthroplasty. Id. At his next follow-up on January 19,2005, Mr. Falbo reported that he was continuing to have ongoing knee pain; Dr. Hayek noted that Mr. Falbo continued "to complain of pain on the medial aspect of the right knee," that there was "exposed bone on the knee in the

medial compartment," and that there was "tenderness over the medial joint." Record at 164. He reiterated that, at that point, Mr. Falbo's options were to pursue "non-operative treament" or to pursue "total knee arthroplasty or unicompartmental." *Id.* Mr. Falbo opted for the latter, undergoing unicompartmental athroplasty of his right knee on February 8, 2005.

At a follow-up appointment on February 22, 2005, Dr. Hayek reported that Mr. Falbo was "doing well without significant problem," that he had transitioned to a cane and that he was getting home therapy. Record at 163. By March, Dr. Hayek noted that Mr. Falbo was "improved," that he was continuing to receive therapy, and that he had "excellent motion"; Dr. Hayek also noted that Mr Falbo had "some soreness with side to side movement" and some "activity related discomfort," but no "giving way" and no significant swelling. Record at 162. Dr. Hayek also noted, in his March 16, 2005 progress notes, that Mr. Falbo was unable to work and that he should continue to receive physical therapy 2-3 times per week for another 6-8 weeks. *Id.*

At a follow-up appointment in April, Mr. Falbo reportedly was "doing quite well, progressing nicely," though he reported that he suffered a setback when he was hit in the knee by a cart while attending a craft show. Record at 162. Mr. Falbo had "mild swelling and soreness over the medial compartment over the MCL," and he was unable to bear weight fully on his right knee.

9

*Id.* Dr. Hayek recommended that he "minimize physical therapy," rest and ice his knee, and obtain a CRP as part of his pain evaluation." *Id.*, 161-162.

By June, Mr. Falbo still reported experiencing mild to moderate pain with mechanical weightbearing; he also reported that he was having some trouble with stairs. Record at 161. Similarly, at a follow-up appointment in August, he reported "continuing mechanical pain at the medial aspect of his right knee with standing and weightbearing." Record at 160. Dr. Hayek noted that Mr. Falbo was "symptomatic and shows bone remodeling," which was "consistent with his symptoms." *Id.* He noted that Mr. Falbo might improve with time, but might also require "a revision to a total"; because Mr. Falbo wanted to try to avoid the latter, Dr. Hayek recommended waiting six weeks to see if he improved at all. At his follow-up in September, Mr. Falbo reported that he had experienced "no substantial improvement"; he was continuing to have pain over the medial aspect of his right knee, and he was continuing to experience pain "with mechanical," with weightbearing, and with walking. Record at 160.

The record shows that, on October 4, 2005, Dr. Hayek performed a revision total knee arthroplasty. Record at 155. In his operative report, Dr. Hayek described Mr. Falbo as a "48-year-old gentleman, status post ACL reconstruction and unicompartmental arthroplasty with continuing severe pain with a

10

history of cirrhosis and hepatitis C." *Id.* According to the
report, the arthroplasty was performed without complications.

At a follow-up appointment a couple of weeks after the
surgery, Mr. Falbo reported that he was still feeling "general
pain about the knee, difficulty with weightbearing, pain with
ROM." Record at 216. Dr. Hayek reported that Mr. Falbo's range
of motion was "restricted by pain," but that he could come within
15° of full extension and could flex to around 85°. *Id.* Dr.
Hayek recommended activity modification, rest, protection and
protected weightbearing, and he also recommended that Mr. Falbo
decrease his therapy and work on gentle motion. *Id.*

By November 2005, Mr. Falbo was "notably improved"; he
reported having 50% less pain and was able to walk with a
"straight postured gait"; his motion was improved, and his thigh
was less tender. Record at 216. By December, Mr. Falbo reported
being "much improved"; his pain had improved, he was ambulatory
independently, his motion was improved and he was feeling "much
better." Record at 215. Dr. Hayek recommended that Mr. Falbo
continue to work on range of motion on his own and avoid any
impact exercises; he noted that Mr. Falbo was "past the jeopardy
point and issues with the stress riser." *Id.*

The record shows that Mr. Falbo continued with his follow-up
care through the first part of 2006. At an appointment on
January 12,2006, Mr. Falbo reported "improvement dramatically in

11

the medial knee," and reported being able to walk better; on the other hand, he also reported that he was having "difficulty with kneeling" and that he had "some pain on the lateral aspect of his knee," which "radiate[d] into the area of the fibular head and around the peroneals and downward." Record at 214. Dr. Hayek noted that, in his view, "it is unlikely that he will return to a laboring job as an electrician. I think he will be permanently restricted from this and has a permanent impairment. A light level job might be capable." *Id.*

At his appointment in February, Mr. Falbo reported "being in an excellent state" until he overdid it on the bicycle and then developed increasing pain and swelling in his knee. Record at 213. Later that month, after doing some blood work, Dr. Hayek advised Mr. Falbo to go to the emergency room and told him he would likely need to see a hematologist. Record at 213.

The record shows that, by March, Mr. Falbo had, in fact, seen a hematologist (Dr. Joshi), and he reported that he had improvement in his platelets; he also reported that his knee had improved. Record at 212. In his noted from this appointment, Dr. Hayek stated that he had had a long discussion with Mr. Falbo and explained that, in his view, his knee issues were related to his medical status, his poor liver function, use of alcohol and thrombocytopenia; Dr. Hayek reported that he strongly encouraged Mr. Falbo to "stop the substance use and be seen by a GI doctor

12

or to consider Interferon for his Hep C." *Id*. In Dr. Hayek's view, "his general capacity to bleed, especially into the knee, will be recurrent should these other issues not be optimally managed." *Id*. Dr. Hayek advised Mr. Falbo to come back on a yearly basis, sooner if he had problems or difficulties. *Id*.

In addition to the progress notes and reports from Dr. Hayek, the record also includes a March 22, 2006 letter from Dr. Joshi, the hematologist to whom Dr. Hayek had referred Mr. Falbo; in his report to Dr. Hayek, Dr. Joshi concluded that Mr. Falbo's knee pain, swelling and bleeding, were related to his thrombocytopenia and his liver decompensation, and he noted that he had advised Mr. Falbo to stop drinking. Record at 218.

With regard to his lung issue, the record shows that Mr. Falbo went to the emergency room on January 9, 2004, complaining of acute upper chest pain; the attendant discovered a 2 cm nodule in his left lung and recommended an open lung biopsy, which was scheduled for February 19, 2004. Record at 134. During the ER work up, the attending physician noted that Mr. Falbo had a history of cirrhosis of the liver and that he was a heavy smoker - averaging a pack to a pack and a half per day for almost 30 years. *Id*. At a consultation the day before the scheduled biopsy, Dr. Dominic Tolitano noted that Mr. Falbo had a chronic productive cough of grayish sputum, but no other complaints. Record at 135. According to Dr. Tolitano, at the time of the

13

consultation, Mr. Falbo reported smoking a pack a day for almost thirty years, and he reported that he "still drinks alcohol but only several times a day." *Id.*

The record shows that, in addition to his treating physicians, Mr. Falbo saw a medical consultant, who examined Mr. Falbo on July 2, 2005 at the behest of the SSA. According to a report prepared by that consultant, Dr. Ibrahim Sadek, at the time of the exam, Mr. Falbo reported smoking a pack a week and drinking occasionally. Record at 148. Dr. Sadek noted that Mr. Falbo's knee problems began in 1997, when he started feeling pain and then underwent at arthroscopy with ACL reconstruction, and then a partial knew arthroplasty in February 2005; according to Dr. Sadek's report, Mr. Falbo stated that he suffered pain and swelling after any amount of walking, and that pain made it difficult for him to do any bending, kneeling or climbing stairs. Record at 148. After examining Mr. Falbo, Dr. Sadek noted that Mr. Falbo had a well healed scar over his right knee, with mild diffused swelling and no joint effusion; he had full range of motion of both hips, both ankles and his left knee, but limited range of motion of his right knee – 0-100 degrees with discomfort. Record at 149. Dr. Sadek noted that Mr. Falbo had a very slight limp favoring the right leg. *Id.*, 150.

On July 11,2005, Dr. Virgilio Pilapil, also a medical consultant with the SSA, completed a Physical Residual Functional

Capacity Assessment for Mr. Falbo; Dr. Pilapil did not examine
Mr. Falbo, but appeared to base his assessment on the results of
Dr. Sadek's exam, as well as the other evidence in Mr. Falbo's
file. Record at 140-147. According to Dr. Pilapil, Mr. Falbo
had a history of degenerative joint disease, which affected his
right knee, and a prior lung surgery, which successfully removed
a benign nodule. In Dr. Pilapil's opinion, Mr. Falbo could
occasionally lift 20 lbs. and frequently lift 10 lbs.; he could
stand and/or walk about 6 hours in an 8-hour workday and sit
about 6 hours in an 8-hour work day; he could occasionally climb
ramps and stairs, balance, stoop, kneel, crouch and crawl, but
should avoid entirely climbing ladders, ropes and scaffolds; he
had unlimited ability to push and pull and no manipulative,
visual or communicative limitations, though should avoid
concentrated exposure to hazards such as machinery and heights.
Record at 141-147.

On February 12, 2006, the ALJ issued his decision, finding
that Mr. Falbo was disabled during the period from November 19,
2004 through January 12, 2006, but that he was not disabled
before or after this period. Mr. Falbo appealed, and, on June
21, 2007, the Appeals Council denied review, making the ALJ's
decision the final agency decision. Mr. Falbo then filed this
lawsuit on August 21, 2007. The case is presently before the
Court on cross motions for summary judgment: Mr. Falbo asks the

15

Court to reverse the ALJ's decision or remand for further
proceedings; the Commissioner asks the Court to affirm the
decision to deny benefits.

## Discussion

An individual claiming a need for DIB must prove that he has
a disability within the meaning of the Social Security Act.
Eligibility for benefits is determined, under the social security
regulations, using a five-step, sequential analysis. First, the
ALJ must determine if the claimant is currently employed; second,
a determination must be made as to whether the claimant has a
severe impairment; third, the ALJ must determine if the
impairment meets or equals one of the impairments listed by the
Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1;
fourth, the ALJ must determine the claimant's RFC, and must
evaluate whether the claimant can perform his past relevant work;
and fifth, the ALJ must decide whether the claimant is capable of
performing other work in the national economy. *Knight v. Chater*,
55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the
claimant bears the burden of proof; at step five, the burden
shifts to the Commissioner. *Id.*

A district court reviewing an ALJ's decision to deny
benefits must affirm if the decision is supported by substantial
evidence and is free from legal error. 42 U.S.C. § 405(g);
*Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

16

Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)(citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the Court may meaningfully review the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if, because the decision is not sufficiently articulated, meaningful review is not possible, the Court must remand. *Id.*

Mr. Falbo argues that the ALJ's decision must be reversed and/or remanded for several reasons: first, he argues that the ALJ erred in finding that his impairment did not meet or equal a listed impairment; second, he argues that the ALJ erred in

17

finding that he had the RFC to perform light work; and third, he argues that the ALJ erred in finding that he was not disabled after January 12, 2006. The Court considers each argument in turn.

Mr. Falbo first argues that the ALJ erred when he found that the severity of his impairments did not meet or equal one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. In fact, Mr. Falbo argues, the medical evidence establishes that his impairments meet Listing 1.03.

The ALJ determined that Mr. Falbo had the severe impairments of "knee pathology with resulting surgeries, Hepatitis C, Thrombocytopenia, and cirrhosis of the liver." Record at 18. Yet, the ALJ determined, he "has not had an impairment or combination of impairments that meets or medically equals any section of the Listing of Impairments at Appendix 1, Subpart P, Regulations No. 4 at any time material to this decision." *Id.* That is the sum total of the ALJ's explanation on this issue. Under the circumstances, this is not enough. *See Barnett v. Barnhart*, 381 F.3d 664 (7th Cir. 2006)(reversing and remanding to the Commissioner a case where the ALJ devoted just two sentences to the Listing of Impairments issue and therefore made it impossible for the court to tell, on review, if the ALJ ever considered whether the claimant's impairments met or equaled the relevant listed impairments).

18

Listing 1.03 provides that a claimant is presumptively disabled if he had "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R. §404, Subpart P, Appendix 1. Certainly, there can be no dispute that Mr. Falbo had "reconstructive surgery of a major weight-bearing joint"; the only issue here would seem to be his ability (or inability) to ambulate effectively.

According to 1.00B2b, to be able to ambulate effectively,

> individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

20 C.F.R. §404, Subpart P, Appendix 1, §1.00B2b(2). To be sure, there is evidence in the record that would support a finding that Mr. Falbo could ambulate effectively as of January 12, 2006; progress notes from that date show that Mr. Falbo was "able to walk better" and there is nothing to suggest that he was using any kind of assistive device at that point.

19

But there is also evidence in the record that suggests that he never really regained his ability to ambulate effectively as that phrase is defined in the listing. For example, at the hearing, Mr. Falbo testified that his knee keeps him from effectively doing chores and shopping (he can get to the grocery store, but has to use a motorized cart to get around and cannot carry any heavy bags); he testified that he has to ice and elevate his knee constantly and that minor activity - walking, standing, even sitting funny - causes his knee to swell and become painful. Yet, significantly, the ALJ failed to discuss Mr. Falbo's ability (or not) to ambulate effectively. It is the ALJ's job to determine whether Mr. Falbo's impairments equalled Listing 1.03. And because this Court is unable to tell whether he even considered the issue, remand is appropriate here, just as it was in *Barnett*.

As a corollary to his argument on the listing, Mr. Falbo argues that the ALJ improperly punished him at step three by finding that his condition was caused by his drinking. In response, the Commissioner argues that, although "the record certainly suggested that Mr. Falbo's medical condition was complicated by his continued drinking, that fact was immaterial to ALJ Kraybill's Step 3 finding." Defendant's Response to Plaintiff's Motion for Summary Judgment, p. 11. But the truth is, in so arguing, the Commissioner can only be speculating; the

20

ALJ never explained how he reached the conclusion he reached regarding the listings.

The Court notes that, if, on remand, the ALJ determines that Mr. Falbo is unable to ambulate effectively within the meaning of the listing, the inquiry would end, as Mr. Falbo would be presumptively disabled. But because the issue could go either way, the Court will go on to consider Mr. Falbo's arguments concerning the ALJ's RFC assessment.

With regard to his residual functional capacity, Mr. Falbo argues that the ALJ erred in finding that he had the residual functional capacity to perform light work, including jobs that existed in significant numbers in the national economy. The Court agrees that the ALJ's RFC is problematic for a couple of reasons.

First, in reaching the conclusion he reached concerning Mr. Falbo's RFC, the ALJ discounted Mr. Falbo's complaints of pain and his testimony concerning how his pain and his condition affected his ability to work. Specifically, the ALJ found that although "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible prior to November 19, 2004 and after January 13, 2006." Record at 21. The ALJ's opinion suggests that he discounted Mr. Falbo's

testimony concerning his symptoms, in part, because he lied about his use of alcohol, and, in part, because Mr. Falbo failed to pursue the recommended follow-up measures, which also counted against him. The former certainly appears to be true, though without more, it is hard for the Court to imagine that his inconsistent testimony on this issue is cause to throw out everything he said, but only as to the time period before November 19, 2004 and after January 13, 2006. And, with regard to the latter, the ALJ did not explain what follow-up procedures he was referring to, and it is not clear from the record that he did fail to pursue follow-up measures. To the extent the ALJ is referring to physical therapy, Dr. Hayek's progress notes suggest that Mr. Falbo had decided to continue to work on his exercises on his own and that he acquiesced in that decision. If the ALJ was discounting Mr. Falbo's claims because of some other measures, he should explain what those measures were and how they affect Mr. Falbo's credibility.

Just as troubling, in his findings, the ALJ almost seems to be assuming that he explained more than he actually did - at one point, he states that the light residual functional capacity conclusions are supported by a variety of reasons "as explained throughout this decision," record at 19, and, at another point, he states that Mr. Falbo's ability to perform the full range of light work "has been somewhat impeded by additional limitations

*as outlined above*." Record at 22. Yet the Court is truly at a loss as to how the ALJ reached the conclusion he reached concerning Mr. Falbo's ability to perform light work to the extent he did – contrary to his statements, he did not outline anything above and he didn't explain his reasons at all, let alone throughout the decision. He appears to reject the medical consultants' opinions concerning Mr. Falbo's RFC – and, rightfully so, given that they did not have complete information when they rendered their opinions and given that one never even examined Mr. Falbo. Yet he never provides any alternative analysis concerning Mr. Falbo's ability to maintain any kind of gainful employment.

This analysis dovetails with Mr. Falbo's last argument for remand: Mr. Falbo argues that the ALJ erred in finding that he was not disabled; in particular, he argues that the ALJ failed to comply with Social Security Ruling 96-8p, which requires a narrative discussion of the claimant's ability to perform sustained work, and he argues that, if the ALJ had done the required "function-by-function" analysis, he would have had no choice but to conclude, given the evidence, that he lacked the ability to perform light work and was, therefore, disabled even after January 12, 2006.

As this Court interprets SSR 96-8p's "function-by-function" language, the ALJ's written opinion must provide evidence to

23

support his RFC conclusions, but it need not include a specific recitation of every detail of the function-by-function analysis. Quite simply, the ALJ never explains his RFC; he fails to explain what he thinks Mr. Falbo can do in terms of maintaining an eight-hour workday, and he fails to explain how, given the evidence, Mr. Falbo could be expected to hold down a job.

That is not to say that there isn't evidence in the record to support the ALJ's RFC. There is one note from Dr. Hayek that suggests that Mr. Falbo might be able to perform light work. And there is the physical RFC completed by Dr. Pilapil. But the ALJ appears to have rejected this RFC because it was based on an incomplete record and because Dr. Pilapil never examined Mr. Falbo. That leaves just the one remark from Dr. Hayek, and a single comment that light work might be possible would seem to fall significantly short of the "substantial evidence" mark.

## Conclusion

For the reasons set forth above, the Court finds that the ALJ's findings concerning the listings in 20 C.F.R. §404, Subpart P, Appendix 1 were, at worst, inaccurate, and, at best inadequate. The Court also finds that the ALJ's RFC assessment and his finding that Mr. Falbo could perform a wide range of sedentary and light unskilled jobs were not supported by substantial evidence; certainly, the ALJ failed to build an accurate and logical bridge from the evidence in the record to

24

his conclusions on these issues. Accordingly, the Court grants Mr. Falbo's motion for summary judgment and denies the Commissioner's motion for summary judgment. This matter is remanded for further proceedings consistent with this opinion.

Dated: August 6, 2008

ENTER:

ARLANDER KEYS
United States Magistrate Judge